Good morning, Michael Youngdahl, Deputy County Counsel, Santa Barbara County, on behalf of Appellants and Cross Appellees, Defendants, also Schmidt, Morris, and Rogers, all Santa Barbara County Sheriff's Deputies. Before I address the central issue in this matter, just briefly, the court issued an order approximately 10 days ago regarding jurisdiction to hear the cross appeal. And I'd simply say that while that matter was not briefed before this court, the answer to the question, which is does the court have jurisdiction to actually hear the cross appeal, is no. There was no final judgment under 1291, and this is a classic situation where what the court did is it granted partial summary judgment for the defense. Under those circumstances, the remedy is, assuming the case went to trial and there was a final judgment at that time, the remedy is to, at that point, appeal that piece of the case and any other piece of the case that the plaintiff wished to at that time. So with that, I'll move on then to the central issue in the case, which is whether or not a peace officer is entitled to qualified immunity for using deadly force against a gunman who points a gun at him. That's really what the case is about. So how is it clear that the gun was pointed at him? We're on summary judgment here now. So we have to accept the facts, the evidence, and the light most favorable to the opposing party. And we have here the victim, deceased, not able to testify for himself. And our case law says, in that circumstance, we need to take special care and maybe put a thumb on the scale in some fashion. And I'm not sure that it's so beyond belief that the gun was not being pointed at the time. What evidence do we have on that question? Right. And I think that this is, frankly, what the district court did, is it looked at what it believed were a series of what we would contend are immaterial discrepancies and questioned the credibility of the three deputies regarding whether or not there actually was an immediate threat. So this, though, is a situation where we don't have to just rely on the deputies. This is a case that fulfills the direction of the Scott v. Heinrich case that we can look at other evidence that corroborates what the deputies say. What's the totality of the evidence, viewed in the light most favorable to the other side, that demonstrates beyond whatever you want to call it that there was a gun in his hand at the time? Do you start with the wife's call to the police? Yes. You start there and you move forward. What did she say? Well, she says that her husband has a gun. And, in fact, that's what she's testified to. That's recorded? Yes, exactly. We have the CAD. That is one of the pieces of evidence that corroborates the stories, the testimony of the three deputies. It corroborates the gun. It doesn't corroborate the pointing toward. I mean, I'm not sure you're taking the position that if he had been encountered on the patio, but the gun was hanging at his side, that the officer can fire away, the officer would have reasonably perceived an imminent threat if, in fact, the gun wasn't pointing at him. And it's the gun pointing at part that I'm particularly interested in. What evidence is there that should satisfy us that that was the state of affairs? That's not a disputable fact. All right. So the testimony by the deputies is that the decedent, Mr. George, was holding the gun and then turned to his left and pointed it at Deputy Rogers two times. So the one piece of evidence that we have that that's what happened is, in fact, the bullet trajectory evidence. We have evidence that was submitted by the appellees in their response to the summary judgment motion that the trajectory of the bullet was front to back through the head, which means that rather than being pointed towards the backyard, towards the other two deputies, that the decedent, Mr. George, had actually turned to his left and then faced the deputy, Deputy Rogers. Facing doesn't mean pointing at. I mean, I can point at without facing, and I can face without pointing at. I'm facing you right now. I don't have a gun pointing at you. Absolutely. As it happens, I'm not packing heat today. But I could be down here at the side, you know. And so what is it that tells us that the gun is being pointed? That's right. So in this situation, what we have is we have – it's the – there is no – In essence here, what Your Honor is asking me that the appellants to do is to prove a negative, which is to prove that it was not being pointed. Was there an eyewitness that said the gun was not pointed at the deputies? Correct. Yes, there are no witnesses that indicate that. So what's the evidence that suggests that it wasn't pointed at the deputies? There is no evidence to that effect, and that's exactly the case, Judge Trott. We'll probably ask that on the other side, too. That's right. I doubt the other side will agree, but go ahead. So what we have is we have a situation where we have no evidence that indicates the gun was not being pointed at the deputy, and we have evidence that corroborates all other material aspects of the situation that they were facing that day. We also, if you look at the testimony of the deputies themselves, it is all internally consistent. There are no inconsistencies that are material. The district court pointed out what it thought were inconsistencies in the testimony. For example? For example, Your Honor, the discrepancies that the court pointed out that we contend are immaterial. Is that the question? Yes. For example, who decided to set up the perimeter? The fact is it's undisputed a perimeter was set up. Who actually decided where the perimeter would be and how that was going to happen is really irrelevant. In fact, frankly, whether or not a perimeter was set up is irrelevant under the Billington case. What's next? So the next fact after that is who saw Mr. George first? Again, it's undisputed that the two deputies, that is Morris and Schmidt, and ultimately Deputy Rogers, they all three saw Mr. George on the balcony. Who actually saw him first really doesn't matter. It's irrelevant. And the reality is... Next. The next fact is could Schmidt, Deputy Schmidt, see the gun when he first observed Mr. George on the balcony? So that question, again... What was the evidence that suggested that he couldn't? The only evidence to suggest that he could not is the opinion of the expert. That's right. And that opinion we would submit is totally speculative. It's like the opinion in the Reynolds case. The case which involved the expert who testified that there was a gun against the neck of a suspect, and because the gun was against the neck, that that caused the suspect to turn with a knife. And what's the next discrepancy you say is immaterial? The next discrepancy that I would say... We've read this, but I'd like to sort of go over it. Absolutely. The next discrepancy that the court said was material that we would say is immaterial is whether or not Mr. George could hold the gun with both hands or his right hand. It's undisputed that he actually was holding the gun. And we have the corroborating evidence of the testimony of his wife regarding his activities that day, which shows he certainly was physically capable of holding it. Be more specific. It's undisputed he was holding the gun, but how and where? My recollection is that he was still holding on to the walker at the same time. When he walks out of the door onto the balcony, he has the gun in his left hand against the walker like this. That's according to the deputies. That's according to the deputies, yes. And we know he's capable of doing that based on his wife's testimony regarding what he had done up to that point in time. Frankly, one of the interesting things that jumped out at me when I reviewed the record was that she testified, among other things, that she actually tried to get the gun away from him. She uses the words, she says, at one point, she attempted to yank the gun away from him. She tried to pull it away from him pretty strong. Those are her words. This is before she called? This is right before she called the CHP, yes. Well, 9-1-1, because she was on a cell phone and went to the CHP. And this is excerpts of record pages 70 and 72. Those are the words that she uses regarding what she was trying to do. As your time runs down, there were two issues, whether there was a violation and whether the law was clearly established at the time, such as a reasonable officer would understand that this would be a violation of rights. The district court says you never argued prong two, and so it's dropped that and never addressed it. And you didn't. Well, we did. We did. Not in the oral argument, you didn't. Well, not in the oral argument, but in our briefing, we certainly did. We absolutely did. The district court didn't opine on that. And you let it go, and I don't quite understand that. Is that a waiver? I apologize, Judge Trott. You say we let it go. In the oral argument, and then the court said in its opinion, well, you dropped prong two. That's right. I was not present at the oral argument, but reading the transcript of the oral argument, the subject of whether or not it was clearly established never came up, but it certainly was briefed. And the fact that a particular topic isn't discussed during oral argument doesn't mean there's a waiver, if it's been adequately briefed. It really wasn't all that briefed. All the paperwork said a couple times was, well, the law is not clearly established. You cited Long v. City and County of Honolulu, but there wasn't really extensive discussion in the briefing on this either, was there? That's absolutely right, and the reason is because it wasn't necessary. I mean, this is a situation where, frankly, what would the person who wrote the briefs have said? Well, under the undisputed facts that we know, which is this individual posed an immediate threat to these deputies, they're entitled to qualified immunity. I mean, that's in essence otherwise what the brief would have had to do is pretty much re-argue the facts, because the law certainly was clearly established. The opposite was clearly established. That is that if a suspect points a gun at law enforcement, law enforcement is entitled to use deadly force. So, frankly, this is one of those situations where I'm unsure how much more briefing would have been required for the question to be preserved. This is one of those situations where certainly the issue was raised. You are arguing here that the law was not clearly established. Correct. Not clearly established that under these circumstances what these deputies did, that is to employ deadly force, would have constituted a civil rights violation. That's absolutely the argument, and the reason why is because just the opposite was clearly established. That is under these circumstances it would not constitute a civil rights violation. The premise of that being the state of affairs or the factual scenario that you described, which is the gun is pointing at the officer. Absolutely. Now, what we can review on a qualified immunity appeal is not unlimited. You referred to that already with regard to the cross appeal. Aren't there limitations on what we can review with regard to the denial of summary judgment based on a finding by the district court that there's a genuine issue of material fact? Absolutely. You cannot review the genuineness of the dispute, but you certainly can review whether or not the dispute is material. That's within your jurisdiction. District court conclude there was no genuine issue of material fact with regard to whether the gun was being pointed at the officer. I'm sorry, Your Honor. I've been sick also, so that's why I. I don't. The district court did not, to me, appear to conclude that it was undisputed that the gun was pointed at the officer. The district court did not conclude that it was undisputed. Do you think the district court did conclude that the gun was pointed at the officer? Oh, no. That was off the table. Because if the district court says that, well, there's an issue about that, can we go on and presume, as you have, that, in fact, the gun was being pointed at the officer? Well, you can. You can when there is no dispute of material fact that that, in fact, is what happened. I mean, in this situation, what the district court did is it took a series of immaterial or nonexistent discrepancies and it sort of amalgamated them and by magic said, okay, because I have these various immaterial inconsistencies, therefore there is a question of credibility regarding what the state of affairs was at the time that the force was used. But, in fact, just because you have a series of immaterial, and again, I would submit, and we argued this in the briefs, that most of these things weren't, in fact, they line up. The testimony is actually consistent. One example, the forming of a perimeter. The question was, well, you know, when did that happen? Who decided to do it? Well, in fact, there were two perimeters. What happened is when Morris and Rogers arrived at the same time, they initially decided that they were going to stay in front of the house. Schmidt then arrived right after them. And at that point, after they go to the back of the house and they look around and they don't see anybody there, they then decide to form a second perimeter around the house. So there really is, the testimony lines up. So from our perspective, there really is no question of facture. We have nothing that's inconsistent with the version of events that the deputies all testified to. And as I say, this is not a situation where you just have to rely on the deputies. You have all of this other, we've mentioned the CAD. What we haven't mentioned is the tenant who testified what she heard. Dropped the gun, dropped the gun. Exactly. Exactly. We haven't talked about the suicide by cop evidence which came in, which it shows, it explains why he acted in the way that he acted. I mean, it makes sense looking at that evidence that, in fact, why he would point the gun. Otherwise, it doesn't make sense, right? The police didn't know that that's what they had on their hands at the time. Absolutely. But under the Boyd case that Judge Clifton was on the panel on that case, actually, that evidence is admissible. When you have a situation where you have a conflict about the central core of the case, in this case, the conflict is was there an immediate threat, then suicide by cop evidence can be admissible. And in the Boyd case, the question was whether or not the defendant had acted, pardon me, the plaintiff, who was a decedent at that point, had acted in a way which provoked the shooting. All right. Thank you, counsel. Your time has expired. Thank you. We'll hear from the other side. Good morning. May it please the Court, Stephen Dunkel on behalf of appellee Carol Ann George. Good morning, Your Honors. With regard to the Court's directive regarding the cross-appeal, after receiving that I did read through the case law more carefully. I initially was inclined to argue that the facts are intertwined enough, but after reading through the cases more thoroughly, I have to concede that there is not jurisdiction for the cross-appeal. With regard to what's been characterized as the central issue in the matter, I believe there's a way of putting it more clearly, and I believe Judge Clifton has done that, which the issue is in order for there to be immediate danger under appellant's theory, there would have to be an undisputed fact that Mr. George not only had a gun, but that he was pointing it at the officers or otherwise creating some sort of threat beyond just having a gun in his own home. This is an unloaded question. And do you concede that he had a gun, or do you dispute that he had a gun, period, when he was out there with his walker? No, we concede he had a gun. His wife called because she was concerned about him having a gun. And he had it with him on the walker. The question is what he did with it. Correct. All right. Yes, and when the facts are viewed as they should be for the summary judgment standard, in the light most reasonable, and when inferences are drawn reasonably in favor of the party opposing summary judgment, there still remains a disputed issue of material fact as to what he was doing with the gun. Well, you heard I asked counsel on the other side to go through the list of the discrepancies so that I could talk to you about them. It seems to me that who set up the perimeter doesn't have anything to do with pointing the gun. Well, and the reason it does have to do with the big picture here in terms of whether there was a dispute over whether there's a threat is because this is a situation in which the deputies rushed into the backyard, put themselves in a position where they were relatively close to Mr. George, and now are using their closeness to him to rationalize the need to shoot him based on danger. And the fact that there's not a coherent story as to how that decision was made tends to undermine that that was a reasonable course of action under those circumstances. And that ties in directly to what he was doing with the gun at the time? That the neighbor says the words were heard, drop the gun, drop the gun? It ties into, with respect to the officers, with all due respect to them, it ties into their credibility when they report that he had pointed the gun at Deputy Rogers because it's a situation in which their conduct is being scrutinized following a shooting and they don't have their story straight with regard to exactly what happened leading up to this. Meaning who saw what first? Meaning who decided what positioning they would be in, which is, according to them, what justifies the shooting is that Rogers is relatively... That seems awfully attenuated from the exact incident when the shooting happened. Well, and the big picture here is Mrs. George is concerned about her husband having a gun and calls the police, and within minutes of them arriving, he's shot dead in the backyard. So I don't think analyzing just the... Well, the central issue is whether he's pointing the gun at them. I don't think that justifies analyzing it completely in a vacuum where we ignore inconsistencies in the officers' versions of events about how they positioned themselves, how he was holding the gun, what they were able to see. It's also, I believe, important to consider the information they had was that Mrs. George was concerned about him having a gun. They verified prior to contacting Mr. George she was already in the front of the house. She was no longer in any kind of perceived danger. So to the extent that the... You know, I mean, all we've been hearing for the last two months on television, including from the president of the United States, is the most dangerous situation in which a police officer can find him or herself is a domestic situation when you're dealing with somebody who's not thinking straight. And I'm not importing things into the record that aren't there, but I'm hearing testimony in Congress that the police responding to these kinds of situations are in more danger than anything else that they do. These are split-second questions. And so the question about who saw the gun, you've got the three officers say that's what happened, and that's why somebody was yelling, drop the gun, drop the gun. And all these discrepancies that the district court seems to have relied on don't seem to go to the central question of what he was doing with the gun when he was shot. They seem to be peripheral. Well, I wouldn't say... First of all, I would tend to disagree with that characterization. Nobody says he wasn't pointing the gun at the officers. Well, in particular, Deputy Rogers says that he lifted it up with two hands standing and pointed at him. Mrs. George's statement was that physically he was incapable of doing that at that time. How could that be when she couldn't even yank the gun out of his hands? Well, and I don't believe she said she tried to yank it out of both of his hands. She was trying to get it away from him also through talking to him. But, again, that's a factual deceit that should be decided by a jury rather than something where we can say it's just undisputed. I mean, the manner in which he's pointing at the officer being directly contradicted by what his wife who knows... Well, there are little things that seem disputed, but I'm having a hard time tying that to the incident that we're worried about. Well, in the incident we're worried about, I think it's also important to consider that putting the label on something as a domestic situation doesn't necessarily tell the whole story. No, there's elements of the domestic situation. Right, the element... Are in sort of a scramble over the gun. And there was the call, the 911 call. There was the call. I don't believe the officers were informed that there had been a scramble over the gun, though, ahead of time. At the time, they knew she was... That kind of helps the officer's position. They're getting called into a situation. They don't know what's going on. Well, they know it's a 415. They know it's dangerous. They know it's a 415 domestic, which is disturbing the peace. It's a domestic incident which could run the gamut of various circumstances. It's the most dangerous call that a police officer can get, 415 domestic. And in bank, we've as much said that because there's national findings on that. Well, it would have been much more dangerous if there was an active shooter. It would have been much more dangerous if they knew he had threats. I mean, within the realm of 415 domestics, there is some variance. And I would say here, having the wife out front in particular and not having other people around the person that they're looking at. And the wife says he has a gun. When did that occur? The wife said he had a gun when she called 911. Right. Okay. And when the officers came, did she tell the officers the same thing? She attempted to talk to the officers, and they didn't take the time to get the information from her. I think she did verify that he had a gun. She wasn't able to say he just had brain surgery, that she was concerned about his mental health, his physical limitations, and that sort of thing because they didn't ask. It's a terrible tragedy. It's another example of what happens when guns are lying around. That's correct. It is a terrible tragedy. I do think, however, that there's a dispute here as to exactly what happened. This is one of those cases where the decedent would be the logical person to contradict the officer's version of events. But since he's not around, it's imperative that the court scrutinize the rest of the circumstances. If we get the prong two, what are the clearly established cases or statutes or whatever you want to call them that say that this necessarily was a violation of rights? Well, if we get to prong two, and if we're talking about if he's pointing the gun at the officers, if he's pointing the gun at the officers, then that's a different story. If he's just holding a gun, then the clearly established cases are Garner v. Tennessee. Well, I'm not so sure about that. Harris v. Rotter, nearly holding a gun. Garner v. Tennessee was a kid running away from a nickel-and-dime crime. This is a different situation. There's no doubt he had a gun. There's no doubt he was mentally unstable. There's no doubt that the wife was very, very scared. And he's out on a roof. He's not on a roof. He's on a balcony. And the wife's scared for him. She's calling because she's concerned about him and his mental health and him having a gun. So the fact that she makes that call, and then minutes later he's shot with a couple of assault rifles in his backyard, I think that's what the tragedy is rather than a situation in which the officers did have a coherent plan, gathered the necessary information, and approached it not as an active shooter kind of situation where it was imperative that they get back there as quickly as possible and, you know, stop him from using the gun, which they didn't have any information he was going to do anything with it other than potentially harm himself. I would also cite Harris v. Roderick. I mean, the point being if he is just possessing a gun in his own home, that by itself doesn't create an immediate threat. On the other hand, if the evidence were to show that he was pointing it at the officers, which is disputed in particular because of Mrs. George's statement that he was physically incapable of doing that, then that's not enough to win on summary judgment. And I do think the circumstances that lead up to the shooting are important. I mean, you can't analyze the immediate threat without understanding the events that led up to that. For instance, if a police officer jumps in front of a moving car and then shoots the driver and said it was justified because he was about to hit me, you can't ignore the jumping in front of the car aspect of it. It doesn't necessarily mean it decides the whole question, but there's more to this than just the vacuum of what happens in the immediate second that happens before the shooting. In addition to the Carol George's statements, you have the issue of the other officers, Morris, having a contradiction regarding whether it was in the right hand or the left hand. There's an issue of when Schmidt said he saw the gun, whether he actually could have seen that. While it's easy to dismiss someone hired by the plaintiff's side as an expert, the case law does say that that should be considered in a case like this where the other logical witness has been killed in the incident. What's the foundation for the expert claiming that they couldn't have seen the gun? The foundation is based on going to the scene and looking where the officer said he was standing and taking measurements and that sort of thing. Also, listening to the testimony or reviewing the testimony anyway where the repeated order leading up to this is to show me your hands. There's also a statement from, I believe it's Deputy Hess, who's not able to see what's happening but hears shots and then hears someone say put down the gun or put it away or something to that effect that creates an additional dispute there. In summary, this is a summary judgment motion. In order to overturn this decision, this court would have to find that Judge Marshall got the facts completely wrong, at least to the extent that there's any kind of dispute at all and would have to, I believe, ignore the case law that says that where the decedent is the only person who could logically rebut the evidence that you have to carefully look at the other factors as well. Otherwise, anytime there's a report of someone in a house with a gun, the police can go in and shoot that person almost regardless of the circumstances as long as their version of it would support that and there'd be no way to dispute that from the side of the wife of the decedent. You don't have to parade that horrible around because that's not what's going to happen. Don't get me wrong. I'm not going to hold that police can wander into a house anytime they want to and just gun down somebody. Nor would police officers do that. What I mean to say, though, is there's a reason that case law suggests scrutinizing the other facts. I think the reason is otherwise you just get the one side. If you make the evidentiary standard, it has to be live testimony from someone who was an eyewitness to the event. I think this is one of those cases that falls into that category and that the case law says that excessive force cases should not be routinely decided on. Summary judgment, I don't think this is the exceptional case where there's no disputed evidence. I think Judge Marshall got it right unless there's other questions I'll submit. Thank you, Counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Clifton